UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**COPY**

**05** **674**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JANE DOE and JOHN DOE,

                      Plaintiffs,

    - against -

INTERFAITH MEDICAL CENTER, INC.,

                      Defendant.

Civil Action No.

AMON, J.

**FILED**
IN CLERK'S OFFICE
U.S DISTRICT COURT E.D.N.Y.

FEB - 4 2004

BROOKLYN OFFICE

GO, M.J.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## ORDER TO SHOW CAUSE TO PROCEED ANONYMOUSLY

        Upon consideration of the Plaintiff's Complaint, Plaintiffs' Memorandum of Law in Support of Order to Show Cause to Proceed Anonymously, dated January 28, 2005, and the accompanying Declarations of Plaintiffs, dated January 27, 2005 and Steve Vaccaro, dated January 28, 2005 submitted herewith,

        IT IS ORDERED that Defendant show cause before this Court, before the Honorable _Carol Amon_, of the U.S. District Court for the Eastern District of New York at 225 Cadman Plaza East, Brooklyn, New York 11201 by papers filed on February _11_, 2005 by 5 o'clock p.m. with courtesy copies to chambers, why an order should not be made permitting Plaintiffs to (*a*) file an anonymous complaint, available to the public, using the pseudonyms Jane Doe and John Doe in this action; (*b*) file a non-anonymous Complaint with the clerk to be filed under seal; (*c*) permit them to proceed in this action under the pseudonyms of John Doe and Jane Doe; (*d*) identify their children in connection with this action as Jack and Jill Doe; (*e*) identify

their address as 1000 Main Street, Brooklyn, New York; (f) and file all papers in connection with

this Order to Show Cause under seal; and it is further

ORDERED that pending the above hearing:

(1)     Plaintiffs shall be permitted to proceed anonymously and to file an anonymous
        Complaint in the above-captioned action using the pseudonyms Jane Doe and
        John Doe;

(2)     Plaintiffs shall be permitted to identify their children in the anonymous Complaint
        as Jack and Jill Doe;

(3)     Plaintiffs shall be permitted to identify their address in the anonymous Complaint
        as 1000 Main Street, Brooklyn, New York;

(4)     The non-anonymous Complaint and all papers related to this Order to Show
        Cause filed with the Court will be sealed (*and should not be unsealed even if
        permission to file anonymously is ultimately refused by the Court*);

(5)     Plaintiffs shall serve on the Defendant a Summons and Complaint that identify
        Plaintiffs using their real name, along with a copy of the anonymous Complaint
        identifying the Plaintiffs and their children through their pseudonyms;

(6)     The identities of the Plaintiffs and their children, as well as their address, shall be
        treated as if under seal. The parties and their attorneys are directed not to reveal
        the true names of Plaintiffs or Plaintiffs' children, or their address. However, the
        parties' attorneys may discuss this information with their clients, witnesses,
        paralegals and other legal support personnel to the extent necessary to prepare
        their affirmative cases or defenses; and

(7)     All exhibits, memoranda, affidavits and other papers filed with the Court in
        connection with this action shall be so written or redacted as to exclude the true
        names and addresses of Plaintiffs and their children and to refer to Plaintiffs, their
        children and their address under the pseudonyms set forth above.

ORDERED that copies of this Order and the papers on which it is based be served upon
Defendant by February ___7___, 2005, no later than 5 o'clock p.m.

                                        _____
                                        United States District Judge
                                        Eastern District of New York

Dated: New York, New York
       February ___4___, 2005

            12:33 pm

## CONFIDENTIAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

██████████ and ███████████          :

                          Plaintiffs,     :          COMPLAINT

                                          :          Civ. No. 05-674 (CBA)

          - against -                     :
                                          :          JURY TRIAL
                                          :          DEMANDED

INTERFAITH MEDICAL CENTER, INC.,          :

                          Defendant.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

          Plaintiffs ████ and ███████ by their attorneys Debevoise & Plimpton LLP

and New York Lawyers for the Public Interest, Inc., for their complaint against

Defendant Interfaith Medical Center, Inc. ("Interfaith"), allege as follows:

### PRELIMINARY STATEMENT

          1.     Plaintiffs ████ and ███████ are deaf. They are married and

communicate primarily through American Sign Language ("ASL"). In March 2003,

████████ spent nine days as a patient at Interfaith where she was taken by ambulance

following a suicidal episode. ████████ was observed by Interfaith staff to be "very

depressed," "isolative and withdrawn," and was prescribed individual and group

psychotherapy as well as psychotropic medications. Throughout the nine days, the

████ repeatedly requested a sign language interpreter so that ████████ could receive

and participate in therapy, understand her medication, and otherwise communicate with

hospital staff. Despite these requests, Interfaith refused to provide an interpreter, except

for a single brief visit on the fifth day of ████████ stay. By refusing to provide ████

████ with an effective means of communication, Interfaith discriminated against her on

21881536v1

## CONFIDENTIAL

the basis of her disability, denied her the same treatment provided to patients without her

disability, and prevented her from participating in decisions affecting the treatment she

did receive.

    2.    ██████ also needed, and repeatedly requested, an interpreter in order to

communicate effectively with Interfaith staff concerning his wife's background,

diagnosis, treatment and prognosis.  By refusing to provide an interpreter, Interfaith

discriminated against him on the basis of his disability, prevented him from participating

in the decisions affecting his wife's treatment, and denied him the privileges routinely

afforded to family members of other Interfaith patients.

    3.    Interfaith's refusal to provide adequate interpreter services during ████

████ hospitalization reflects the hospital's policy and practice of not providing sign

language interpreters for patients who are deaf.  Because the ████ and their children

live approximately one block from Interfaith, they have on numerous prior occasions

sought emergency and outpatient care there.  On virtually every one of these occasions,

the ████ have been denied an interpreter.

    4.    Interfaith's policy and practice of failing to provide interpreters to patients

and family members who are deaf discriminates against the ████ on the basis of

disability by denying them effective communication and adequate and equal health care

services because they are deaf.  Because they live in such close proximity to Interfaith

and regularly utilize services at Interfaith, the ████ family is threatened with receiving

discriminatory and inadequate care in the future.  Interfaith's discriminatory policy and

practice presents a threat of irreparable and recurring harm to the ████

2

5.      These discriminatory actions and policies violate (*1*) Title III of the

Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181, *et seq.*; (*2*) Section 504 of

the Rehabilitation Act of 1973, 29 U.S.C. § 794; (*3*) the New York State and City Human

Rights Laws, N.Y. Exec. Law § 296(2)(a), New York City, N.Y., Admin. Code § 8-

107(4); and (*4*) the New York Patients' Bill of Rights, 10 N.Y.C.R.R. § 405.7.  Plaintiffs

seek damages and injunctive relief under these statutes and regulations.

## JURISDICTION AND VENUE

6.      The Court has subject matter jurisdiction over this action under 28 U.S.C.

§ 1331, which provides for original jurisdiction of federal courts in all civil suits arising

under the Constitution and laws of the United States.

7.      The Court also has subject matter jurisdiction under 28 U.S.C.

§ 1343(a)(4), which provides for original jurisdiction of federal courts in all suits arising

under any Act of Congress providing for the protection of civil rights, including the

ADA, 42 U.S.C. § 12188(a)(1) and Section 504 of the Rehabilitation Act of 1973, 29

U.S.C. § 794.

8.      The Court also has subject matter jurisdiction under 28 U.S.C. § 1367.

9.      Venue is proper in the Eastern District of New York under 28 U.S.C.

§ 1391(b), as it is the judicial district in which a substantial part of the events or

omissions giving rise to the claim occurred and in which all parties reside or are located.

10.     Plaintiffs' action for declaratory and injunctive relief, and for other

appropriate relief, is authorized by 28 U.S.C. §§ 2201 and 2202, the ADA (42 U.S.C. §

12181 *et seq.*), Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794(a)), Rule

57 of the Federal Rules of Civil Procedure, N.Y. Exec. Law § 296(2)(a), N.Y. Admin.

Code § 8-107(4), and N.Y. Public Health Law § 2801-c.

3

## PARTIES

Plainti██████████

11.     Plaintiff █████████ age 32, was a patient at Interfaith from March 22, 2003 to March 31, 2003. ████████ currently lives at █████████████████ ███████████████ which is where she lived at the time of her hospitalization at Interfaith. Her home is located about a block away from Interfaith.

12.     ███████ is deaf and communicates primarily through ASL.  ASL is a complete, complex language that differs dramatically from English and has its own syntax, grammar, and vocabulary.  For all but the simplest communication with hearing individuals who do not communicate through ASL, she requires a qualified sign language interpreter.

13.     ███████ is married to ████████ who also is deaf.  They have two children: █████ who is 9, and ███████ who is 4.

14.     ███████ is an individual with a "disability" for purposes of the ADA and Section 504 of the Rehabilitation Act of 1973, as her hearing impairment constitutes a physical impairment that substantially limits one or more of her major life activities.

15.     ███████ is a person with a "disability" for purposes of the New York State Human Rights Law, as her hearing impairment is a physical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques.

16.     ███████ is a person with a "disability" for purposes of the New York City Human Rights Law as her hearing impairment constitutes a physical impairment.

17.     ███████ and her children have received emergency and routine care at Interfaith and will receive emergency care there should they need it due to their close geographical proximity to Interfaith.  Additionally ████████ utilizes Interfaith for routine medical needs and intends to continue to do so.  As recently as December 2004,

4

████████ sought routine medical care for an eye infection at Interfaith and Interfaith again failed to provide an interpreter. If Interfaith were compelled to provide effective communication as required by law ████████ also would seek routine care for her children at Interfaith.

Plaintiff ████████

18.    Plaintiff ████████, age 38, is ████████ husband. ████████ lives with his wife and children at ████████████████████████ which is where he lived at the time of his wife's hospitalization at Interfaith.

19.    ████████ is deaf and communicates primarily through ASL. Like his wife, ████████ requires qualified sign language interpreters for all but the simplest communication with hearing individuals who do not communicate through ASL.

20.    ████████ is an individual with a "disability" for the purposes of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973, as his hearing impairment constitutes a physical impairment that substantially limits one or more of his major life activities.

21.    ████████ is a person with a "disability" for the purposes of the New York State Human Rights Law, as his hearing impairment is a physical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques.

22.    ████████ is a person with a "disability" for purposes of the New York City Human Rights Law as his hearing impairment constitutes a physical impairment.

23.    Interfaith is where ████████ and his family will receive emergency care while at or near their home because it is the hospital nearest their home. If Interfaith were compelled to provide effective communication as required by law, ████████ also would seek routine care for himself and his children at Interfaith.

5

21881536v1

Defendant Interfaith Medical Center

24.    Defendant Interfaith is a group of health care facilities, including a
hospital center located at 1545 Atlantic Avenue, Brooklyn, New York 11213. Interfaith
is a private entity, licensed by the New York State Department of Health, which operates
and provides public accommodations as defined in Title III of the ADA, 42 U.S.C. §
12181(7)(F), and whose operations affect commerce, as defined in 42 U.S.C. § 12181(1).

25.    Upon information and belief, Interfaith receives reimbursements under the
Medicaid and Medicare programs. These reimbursements constitute federal funding
under Section 504 of the Rehabilitation Act of 1973, as defined in 45 C.F.R. § 80, App. A
¶ 121 (Medicare) and 45 C.F.R. § 84, App. A, Subpart A, Def. 1 (Medicaid). Thus, the
hospital services at Interfaith are a program or activity that receives federal funding for
the purposes of Section 504 of the Rehabilitation Act of 1973.

26.    As a hospital, Interfaith is a "place of public accommodation" for purposes
of the New York State Human Rights Law and the New York City Human Rights Law.

27.    Interfaith is a "medical facility" and a "hospital" within the meaning of
New York Public Health Law § 2800. Thus, it is required to maintain the minimum
standards set forth in 10 N.Y.C.R.R. § 400 et seq., including those set forth in 10
N.Y.C.R.R. §405.7.


## STATUTORY AND REGULATORY FRAMEWORK

The ADA

28.    On July 26, 1990, Congress passed the ADA to establish a clear and
comprehensive prohibition of discrimination on the basis of disability.

29.    Title III of the ADA prohibits discrimination by "public
accommodations." For purposes of Title III of the ADA, "[t]he following private entities

are considered public accommodations . . . if the operations of such entities affect

commerce -- (F) . . . professional office of a health care provider, hospital, or other

service establishment." 42 U.S.C. § 12181(7).

     30.    Title III of the ADA provides, <u>inter alia</u>:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a), <u>see also</u> 28 C.F.R. § 36.201(a)(2000).

     31.    Title III of the ADA considers the following, <u>inter alia</u>, to be "discriminatory":

> (ii) [F]ailure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations.
>
> (iii) [F]ailure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aides and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the goods, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden."

42 U.S.C. § 12182 (b)(2)(A)(ii) and (iii); <u>see also</u> 28 C.F.R. §§ 36.202(a)-(c)(2000).

     32.    Further, Interfaith, as a place of public accommodation:

> (a) [S]hall take those steps that may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the public

7

accommodation can demonstrate that taking those steps would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations being offered or would result in an undue burden, i.e., significant difficulty or expense.

(b) . . . The term "auxiliary aids and services" includes –

     (1) Qualified interpreters, notetakers, computer-aided transcription services, written materials, telephone handset amplifiers, assistive listening devices, assistive listening systems, telephones compatible with hearing aids, closed caption decoders, open and closed captioning, telecommunications devices for deaf persons. . ., videotext displays, or other effective methods of making aurally delivered materials available to individuals with hearing impairments;

(c) . . . A public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities.

28 C.F.R. §§ 36.303 (a)-(c).


Section 504 of the Rehabilitation Act of 1973

33.     Section 504 of the Rehabilitation Act of 1973 provides, "[n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

34.     For the purposes of Section 504 of the Rehabilitation Act, a "program or activity" is defined as, among other things, "an entire corporation, partnership, or other private organization, or an entire sole proprietorship . . . which is principally engaged in the business of providing . . . healthcare . . ." or "the entire plant . . . to which Federal financial assistance is extended . . . ." 29 U.S.C. §§ 794(b)(3)(A)(ii) and 749(b)(3)(B).

35.    The administrative regulations promulgated by the Department of Health

and Human Services to enforce the Rehabilitation Act provide, inter alia:

(b) Discriminatory actions prohibited.

(1) A recipient, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of handicap:

(i) Deny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit, or service;

(ii) Afford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(iii) Provide a qualified handicapped person with an aid, benefit, or service that is not as effective as that provided to others;

(iv) Provide different or separate aid, benefits, or services to handicapped persons or to any class of handicapped persons unless such action is necessary to provide qualified handicapped persons with aid, benefits, or services that are as effective as those provided to others; . . .

(vii) Otherwise limit a qualified handicapped person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service.

(2) For purposes of this part, aids, benefits, and services, to be equally effective, are not required to produce the identical result or level of achievement for handicapped and nonhandicapped persons, but must afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs.

(3) Despite the existence of separate or different programs or activities provided in accordance with this part, a recipient may not deny a qualified handicapped person the opportunity to participate in such programs or activities that are not separate or different.

(4) A recipient may not, directly or through contractual or other arrangements, utilize criteria or methods of administration (i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap, (ii) that have the purpose or effect of defeating or

9

substantially impairing accomplishment of the objectives of the recipient's
program with respect to handicapped persons, or (iii) that perpetuate the
discrimination of another recipient if both recipients are subject to
common administrative control or are agencies of the same State.

45 C.F.R. § 84.4 (2004).

New York State Human Rights Law

36.     The New York State Human Rights Law provides, in part, that "[i]t shall

be an unlawful discriminatory practice for any person, being the owner, lessee,

proprietor, manager, superintendent, agent or employee of any place of public

accommodation . . . because of the . . . disability . . . of any person, directly or indirectly,

to refuse, withhold from or deny to such person any of the accommodations, advantages,

facilities or privileges thereof . . . ." N.Y. Exec. Law § 296(2)(a).


New York City Human Rights Law

37.     The New York City Human Rights Law provides, in part, that "[i]t shall

be an unlawful discriminatory practice for any person, being the owner, lessee,

proprietor, manager, superintendent, agent or employee of any place of public

accommodation, because of the actual or perceived . . . disability . . . of any person,

directly or indirectly, to refuse, withhold from or deny to such person any of the

accommodations, advantages, facilities or privileges thereof. . . ." New York City, N.Y.

Admin. Code § 8-107(4).


New York Administrative Code

38.     Pursuant to New York Public Health Law, the New York State

Department of Health has promulgated minimum standards applicable to hospitals such

10

as Interfaith.  Those minimum standards include a "Patients' Bill of Rights," which

includes the rights to:

> (1)     Understand and use these rights.  If for any reason you do
> not understand or you need help, the hospital must provide
> assistance, including an interpreter.

> (2)     Receive treatment without discrimination as to . . .
> disability. . . .

> (8)     Receive complete information about your diagnosis,
> treatment and prognosis. . . .

> (14)     Participate in all decisions about your treatment and
> discharge from the hospital.

10 N.Y.C.R.R. § 405.7(c).

39.     Recognizing the obstacles that people who are deaf may confront in

understanding and exercising their rights as patients in a hospital setting, Section 405.7

affirmatively obligates hospitals to provide interpreters to patients who are deaf:

> (a)     In order to assure that patients are made aware of, understand and can
> exercise their rights, the hospital shall meet the following requirements:

> > (ii)     interpreters and persons skilled in communicating with vision
> > and/or hearing impaired individuals shall be available to patients in the
> > inpatient and outpatient setting within 20 minutes and to patients in the
> > emergency service within 10 minutes of a request to the hospital
> > administration by the patient, the patient's family or representative or the
> > provider of medical care.

10 N.Y.C.R.R. § 405.7(a).

40.     Recognizing the obstacles that persons who are deaf may confront when

they are serving as patient representatives in a hospital setting, Section 405.7

affirmatively obligates hospitals to "communicate effectively to each . . . patient

representative . . . ." 10 N.Y.C.R.R. § 405.7(a)(5).

21881536v1

## FACTUAL BACKGROUND

**Interfaith Refuses to Provide an Interpreter to ████████**

41.   Late in the evening of March 22, 2003, ████████ was brought by ambulance to the emergency room at Interfaith exhibiting symptoms of suicidal ideation. ████████ remained at Interfaith until her discharge on or about March 31, 2003.

42.   Upon arriving at the emergency room on or about March 22, 2003, ████ requested a sign language interpreter, both by attempting to write "interpreter" and by pointing to a sign that stated that patients have the right to an interpreter. Despite these requests, Interfaith failed to provide ████ with an interpreter for the entire time that ████ was in the emergency room, and during her transfer to the hospital ward.

43.   On or about March 22, 2003, after being transferred from the emergency room to the hospital ward at Interfaith, ████ repeatedly asked for an interpreter through written notes with the staff. She also requested the use of a Text Telephone ("TTY"), a phone that allows telephonic communication through typing instead of through voice. Despite her requests, Interfaith refused to provide either an interpreter or a TTY. She was told that the provision of an interpreter was an administrative decision beyond the staff's control.

44.   On or about March 24, 2003, ████ met with an unidentified psychologist at Interfaith. She indicated her need for an interpreter to the psychologist; the psychologist nonetheless attempted to take ████ psychiatric history through written questions and responses. ████ was unable to understand many of the questions or to express herself effectively.

45.   The hospital administered medication to ████ as part of her treatment, but she was never able to learn the nature or potential effects of the medication before taking it because she did not have an interpreter. On or about March 24, 2003, hospital staff demanded that ████ begin taking medication without explaining the

medication's purpose or side effects either through an interpreter or written notes. Hospital staff summoned a security guard and threatened ██████ with restraints and forcible administration of the medication if she did not cooperate. After ██████ began her medication regime, a doctor attempted to communicate with ██████ regarding her treatment and any medication allergies she might have by using written notes. ██████ was unable to understand the doctor due to her limited ability to read and write English.

46.     Because she had no access to a TTY, ██████ was also unable to contact her family. On or about March 24, 2003, ██████ was finally able to call her husband with the help of another patient who knew rudimentary sign language. ██████ communicated with the patient, who then translated ██████ words into spoken English for a telephone relay service. The service then transmitted ██████ message to ██████ by TTY. This fellow patient also asked hospital staff for an interpreter on ██████ behalf, and translated simple requests between ██████ and the nursing staff. With the assistance of this patient and through written notes, ██████ continued to ask for, and was denied, use of a TTY.

47.     During the initial period of her hospitalization, Interfaith staff described ██████ as "very depressed," "isolative," and "withdrawn." On or about March 23, 2003, an Interfaith physician prescribed a treatment plan for her that included individual and milieu (peer group) therapy. Due to the hospital's refusal to provide an interpreter for ██████, however, she did not attend group sessions because she was unable to communicate effectively with the other participants without an interpreter. Similarly, ██████ received little benefit from individual therapy sessions because of the lack of an interpreter.

48.     On or about March 26, 2003, Interfaith finally allowed ██████ to use a TTY to call her husband. After that call, the TTY was locked away in an office and ██████ was again denied access to it by the nursing staff.

13

21881536v1

49.     On or about March 26, 2003, an interpreter was made available for two hours for a meeting with ███████, her therapist, and ███████. This was the sole occasion during ███████ nine-day hospitalization that an interpreter was provided.

50.     Aside from affording ███████ a single, brief opportunity to access an interpreter, Interfaith attempted to provide ███████ with psychotherapy entirely through note writing. Note writing was inadequate because ███████ ability to read and write English is extremely limited and written English is an ineffective form of communication for ███████ for most conversations. ███████ repeatedly tried to inform Interfaith staff that there were words in their notes to ███████ that he knew she could not understand.

51.     On or about March 31, 2003, hospital staff prepared ███████ for discharge without an interpreter present even though she requested one. This preparation included a discussion of the medications that she was to take after discharge, detailing dosages and the purposes of the different medications. ███████ was not able to understand the instructions for discharge, including how to take her medications properly. Interfaith's failure to provide an interpreter prevented ███████ from participating in decisions relating to her discharge.

Interfaith Refuses to Provide an Interpreter to ███████

52.     During ███████ hospitalization, Interfaith repeatedly failed to provide a sign language interpreter to ███████, rendering him unable to communicate with hospital staff about his wife's health and medical treatment.

53.     Upon arriving at Interfaith on the evening of March 23, 2003, ███████ communicated to the staff through writing that he and his wife are deaf. He repeatedly requested a sign language interpreter and wrote notes that said "interpreter" and "New York Society for the Deaf." Interfaith did not provide an interpreter.

14

54.     Later that week, on or about March 26, 2003, ███████ came to the hospital to visit his wife and to speak with her therapist about her treatment. He discovered the written notes that ███████ and the therapist used to communicate during therapeutic sessions. He informed the therapist that there were words in the notes that his wife could not understand, and he reiterated through writing his request for an interpreter.

55.     Throughout his wife's hospitalization, ███████ was stymied in his efforts to understand his wife's diagnosis, treatment and prognosis by Interfaith's refusal to provide an interpreter. Indeed, the only time that Interfaith provided a sign language interpreter to ███████ was on or about March 26, 2003, during a meeting with his wife and her therapist.

Interfaith Will Not Provide an Interpreter in the Future

56.     The ███████ family will receive emergency care as needed in the future at Interfaith because of its proximity to their home. ███████ will continue to receive routine medical care at Interfaith. In the past, both ███████ and the ███████ children have received care at Interfaith. Unless Interfaith changes its policy regarding interpreters for deaf patients and family members, the ███████ are likely to receive discriminatory and inadequate care from Interfaith in the future.

## FIRST CAUSE OF ACTION
### (Injunctive and Declaratory Relief Under Title III of the Americans with Disabilities Act)

57.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 56 hereof.

58.     ███████ and ███████ are individuals with disabilities for purposes of the Americans with Disabilities Act because their hearing impairments constitute physical

15

impairments that "substantially limit[] one or more of the major life activities." 42 U.S.C. § 12102(2)(a).

59.     As a hospital, Interfaith is a place of public accommodation. See 42 U.S.C. § 12181(7)(F). Interfaith's operations affect interstate commerce.

60.     The ██████ live in close proximity to Interfaith and will continue to seek services from Interfaith, including emergency and routine care for themselves and their children.

61.     Mr. and Ms. ██████ require qualified sign language interpreters to communicate with individuals who do not communicate using sign language.

62.     Interfaith's current policy and practice do not ensure that patients who are deaf and require sign language interpreters for effective communication will receive such interpreters.

63.     Interfaith's current policy and practice present a real and immediate threat of future irreparable harm to plaintiffs because they are likely to go to Interfaith if they or their children need certain medical services, in violation of 42 U.S.C. § 12182(a).

64.     ██████ and ██████ have no adequate remedy at law for Interfaith's violation of 42 U.S.C. § 12182(a).

16

## SECOND CAUSE OF ACTION
### (Damages for Violation of Plaintiffs' Rights Under
### § 504 of the Rehabilitation Act of 1973)

65.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 64 hereof.

66.     ████ and ████████ are individuals with disabilities, as their hearing impairments constitute physical impairments that "substantially limit[] one or more of the major life activities." 29 U.S.C. § 705(20)(B).

67.     Interfaith is principally engaged in the business of providing health care and thus is a "program or activity" as defined in 29 U.S.C. § 794(b)(3)(A)(ii).

68.     Interfaith is subject to Section 504 because, upon information and belief, it receives Federal financial assistance in the form of Medicaid and Medicare payments. 29 U.S.C. § 794(b)(3)(B).

69.     During the period from March 22, 2003 to March 31, 2003, despite repeated requests, Interfaith repeatedly failed to provide a qualified sign language interpreter, precluding effective communication between plaintiffs and the hospital staff.

70.     Interfaith's current policy and practice injured plaintiffs because it did not provide them with needed sign language interpretation.

71.     By reason of the foregoing acts, Interfaith intentionally discriminated against plaintiffs and acted with deliberate indifference to their repeated requests for a sign language interpreter in violation of 29 U.S.C. § 794.

72.     As a result of Interfaith's actions described above, plaintiffs were damaged in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### (Injunctive and Declaratory Relief Under

21881536v1

### § 504 of the Rehabilitation Act of 1973)

73.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 72 hereof.

74.     ████ and ████████ are individuals with disabilities, as their hearing impairments constitute physical impairments that "substantially limit[] one or more of the major life activities." 29 U.S.C. § 705(20)(B).

75.     The ████████ live in close proximity to Interfaith and will continue to seek services from Interfaith including emergency and routine care for themselves and their children.

76.     Interfaith is principally engaged in the business of providing health care and thus is a "program or activity" as defined in 29 U.S.C. § 794(b)(3)(A)(ii).

77.     Interfaith is subject to Section 504 because, upon information and belief, it receives Federal financial assistance in the form of Medicaid and Medicare payments. 29 U.S.C. § 794(b)(3)(B).

78.     Interfaith's current policy and practice present a real and immediate threat of future injury to plaintiffs because they will go to Interfaith if they or their children need certain medical services.  Based on its policy and practice, Interfaith would not provide the ████ with qualified sign language interpreters in violation of 29 U.S.C. § 794.

79.     ████ and ████████ have no adequate remedy at law for Interfaith's violation of 29 U.S.C. § 794.

18

## FOURTH CAUSE OF ACTION
### (Damages for Violation of Plaintiffs' Rights Under the
### New York State Human Rights Law)

80.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 79 hereof.

81.     ███ and ███████ are persons with disabilities, as their hearing impairments constitute physical impairments resulting from "anatomical, physiological, genetic or neurological conditions, which prevent[] the exercise of a normal bodily function or [are] demonstrable by medically accepted clinical or laboratory diagnostic techniques." N.Y. Exec. Law § 292 (21)(a).

82.     As a hospital, Interfaith is a place of public accommodation, as defined in N.Y. Exec. Law § 292(9).

83.     From March 22, 2003 to March 31, 2003, despite repeated requests, Interfaith repeatedly failed to provide effective communication to ███ and ███████ concerning ██████ medical treatment and condition. This failure to provide effective communication violated the New York State Human Rights Law, N.Y. Exec. Law § 296(2)(a).

84.     By reason of the foregoing acts, Interfaith intentionally discriminated against ███ and ███████ and acted with deliberate indifference to their repeated requests for a sign language interpreter in violation of the New York State Human Rights Law, N.Y. Exec. Law § 296(2)(a).

85.     By reason of the foregoing acts, Interfaith intentionally discriminated against the ███ and acted with deliberate indifference to their repeated requests for a sign language interpreter in violation N.Y. Exec. Law § 296(2)(a).

19

21881536v1

86.     As a result of Interfaith's actions described above, the ▮▮▮▮ were damaged in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### (Injunctive and Declaratory Relief Under the New York State Human Rights Law)

87.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 86 hereof.

88.     ▮▮▮▮ and ▮▮▮▮ are persons with disabilities, as their hearing impairments constitute physical impairments resulting from "anatomical, physiological, genetic or neurological conditions, which prevent[] the exercise of a normal bodily function or [are] demonstrable by medically accepted clinical or laboratory diagnostic techniques." N.Y. Exec. Law § 292 (21)(a).

89.     As a hospital, Interfaith is a place of public accommodation, as defined in N.Y. Exec. Law § 292(9).

90.     The ▮▮▮▮ live in close proximity to Interfaith and will continue to seek services from Interfaith including emergency and routine care for themselves or their children.

91.     From March 22, 2003 to March 31, 2003, Interfaith repeatedly failed to provide effective communication to ▮▮▮▮ and ▮▮▮▮ concerning her medical treatment and condition. This failure to provide effective communication violated the New York State Human Rights Law, N.Y. Exec. Law § 296(2)(a).

92.     By reason of the foregoing acts, Interfaith intentionally discriminated against ▮▮▮▮ and ▮▮▮▮ and acted with deliberate indifference to their repeated

20

requests for a sign language interpreter in violation of the New York State Human Rights Law, N.Y. Exec. Law § 296(2)(a).

93.    Interfaith's current policy and practice present a real and immediate threat of future injury to plaintiffs because they will go to Interfaith if they or their children need certain medical services.  Based on its policy and practice, Interfaith would not provide the ███████ with qualified sign language interpreters in violation of N.Y. Exec. Law § 296(2)(a).

94.    By reason of the foregoing acts, Interfaith poses a serious risk of discrimination against the ███████ that constitutes irreparable harm, in violation of N.Y. Exec. Law § 296(2)(a).

95.    The ███████ have no adequate remedy at law for Interfaith's violation of N.Y. Exec. Law § 296(2)(a).

## SIXTH CAUSE OF ACTION
### (Damages for Violation of Plaintiffs' Rights Under the New York City Human Rights Law)

96.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 95 hereof.

97.    ███████ and ███████ are persons with disabilities for purposes of the New York City Human Rights Law, as their hearing impairments constitute physical impairments under New York City, N.Y., Admin. Code, § 8-102(16).

98.    Interfaith is a place of public accommodation as it is a provider of "goods, services, facilities, accommodations, [and] advantages" as defined in New York City, N.Y., Admin. Code § 8-102(9).

21

21881536v1

99.    From March 22, 2003 to March 31, 2003, despite repeated requests, Interfaith maliciously and/or with reckless indifference deprived ▮▮▮ and ▮▮▮▮▮▮ of their rights under the New York City Human Rights Law by repeatedly failing to provide them with effective communication.  See New York City, N.Y., Admin. Code, § 8-107(4).

100.    As a result of Interfaith's actions described above, ▮▮▮ and ▮▮▮▮▮▮ were damaged in an amount to be determined at trial.

### SEVENTH CAUSE OF ACTION
**(Injunctive and Declaratory Relief
Under the New York City Human Rights Law)**

101.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 100 hereof.

102.    ▮▮▮ and ▮▮▮▮▮ are persons with disabilities for purposes of the New York City Human Rights Law, as their hearing impairments constitute physical impairments under New York City, N.Y., Admin. Code § 8-102(16).

103.    Interfaith is a place of public accommodation as it is a provider of "goods, services, facilities, accommodations, [and] advantages" as defined in New York City, N.Y., Admin. Code, § 8-102(9).

104.    ▮▮▮ and ▮▮▮▮▮▮ live in close proximity to Interfaith and will continue to seek services from Interfaith including emergency and routine care for themselves or their children.

105.    From March 22, 2003 to March 31, 2003, Interfaith, maliciously and/or with reckless indifference deprived ▮▮▮ and ▮▮▮▮▮▮ of their rights under the New

22

York City Human Rights Law by repeatedly failing to provide them with effective communication. See New York City, N.Y., Admin. Code, § 8-107(4).

106.    Because of Interfaith's discriminatory policy and practice of not providing sign language interpreter services, Interfaith will continue to discriminate against ███ and ██████, which discrimination constitutes irreparable harm in violation of the New York City Human Rights Law.

107.    ███ and ██████ have no adequate remedy at law for Interfaith's violation of the New York City Human Rights Law, New York City, N.Y., Admin. Code § 8-107(4).

### EIGHTH CAUSE OF ACTION
#### (Injunctive and Declaratory Relief
#### Under the New York Patients' Bill of Rights )

108.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 107 hereof.

109.    Interfaith is a "medical facility" and a "hospital" within the meaning of New York Public Health Law § 2800, and is required to maintain the minimum standards set forth in 10 N.Y.C.R.R. § 400 et seq., including those set forth in 10 N.Y.C.R.R. §405.7.

110.    , Interfaith's discriminatory policy and practice of refusing to provide interpreters requested by patients who are deaf violates the minimum standards set forth in 10 N.Y.C.R.R. §405.7. Those standards were violated with respect to ██████ because, despite Mr. and Ms. ██████ repeated requests for interpreter services, she was denied (a) treatment equal to patients who are not deaf; (b) complete information concerning her diagnosis, treatment and prognosis; (c) the effective right to participate in

21881536v1

decisions affecting her treatment and discharge; and (*d*) the services of an interpreter that would have enabled her to effectuate and exercise the foregoing rights.

111.    Under the New York Administrative Code, Interfaith is required to meet these minimum standards for effective communication not only with a patient who is deaf, but also with a "patient representative" who is deaf.  10 N.Y.C.R.R. §405.7(a)(5).  Interfaith repeatedly failed to meet this standard with respect to Mr. ████████role as a representative for his wife during her hospitalization, and with respect to the ██████ parental role in connection with their children's health care received at Interfaith.

112.    Interfaith's current policy and practice present a real and immediate threat of future injury to plaintiffs because they will go to Interfaith if they or their children need certain medical services.  Based on its policy and practice, Interfaith would not provide the ████ with qualified sign language interpreters in violation of 10 N.Y.C.R.R. §405.7.

113.    The ████ have no adequate remedy at law for Interfaith's continuing violation of 10 N.Y.C.R.R. § 405.7.

## JURY DEMAND

114.    Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs ████ and ████████ respectfully request that a judgment be rendered against Defendant Interfaith as follows:

24

(a)   declaring that Interfaith's practices in refusing to provide a qualified sign language interpreter violate Title III of the Americans with Disabilities Act, 42 U.S.C. § 12182;

(b)   declaring that Interfaith's practices in refusing to provide a qualified sign language interpreter violate Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794;

(c)   awarding such damages, and the costs and disbursements of this action, as are permitted by Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794;

(d)   declaring that Interfaith's practices in refusing to provide a qualified sign language interpreter violate the New York State Human Rights Law, N.Y. Exec. § 296;

(e)   awarding such damages, and the costs and disbursements of this action, as are permitted by the New York State Human Rights Law;

(f)   declaring that Interfaith's practices in refusing to provide a qualified sign language interpreter violate the New York City Human Rights Law, New York City, N.Y., Admin. Code § 8-107(4);

(g)   awarding such damages, including punitive damages, and the costs and disbursements of this action, as are permitted by the New York City Human Rights Law;

(h)   declaring that Interfaith's practice of refusing to provide skilled interpreters and/or persons skilled in communicating with hearing impaired persons violates 10 N.Y.C.R.R. § 405.7;

25

(i)     ordering an injunction requiring Interfaith to adopt and implement policies

to provide qualified sign language interpretation to patients and/or family

members who are deaf or hearing impaired in full compliance with the

requirements of Title III of the ADA, 42 U.S.C. §§ 12181- 12189, § 504

of the Rehabilitation Act of 1973, 29 U.S.C. § 794, the New York State

Human Rights Law, N.Y. Exec. § 296, the New York City Human Rights

Law, N.Y.C. Admin. Code, § 8-107, ¶ 4, and 10 N.Y.C.R.R. § 405.7;

(j)     awarding attorneys' fees, costs, expenses, and such other further relief, at

law or in equity, to which Plaintiffs justly may be entitled; and

(k)     granting Plaintiffs such other and further relief as the Court may deem

just, equitable and proper.

Dated: New York, New York
January __, 2005

DEBEVOISE & PLIMPTON LLP
By: _____
Steve Vaccaro (SV-4644)
Ethan J. Leib (EL-6700)
919 Third Avenue
New York, New York  10022
Tel: (212) 909-6000
Fax: (212) 909-6836

and

NEW YORK LAWYERS FOR THE
PUBLIC INTEREST, INC.
Michael D. Silverman (MS-1116)
Marianne L. Engelman Lado (ML-6749)
Rebecca Price (RP-5014)
151 West 30th Street, 11th Floor
New York, New York  10001
Tel: (212) 244-4664
Fax: (212) 244-4570

Attorneys for Plaintiffs

26

21881536v1

CONFIDENTIAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------- x
                            :

JANE DOE and JOHN DOE,          :   Civil Action No.: 05-674 (CBA)

                Plaintiffs,    :

     - against -           :

                            :

INTERFAITH MEDICAL CENTER, INC.,  :

                Defendant.   :

                            :
---------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF
## ORDER TO SHOW CAUSE TO PROCEED ANONYMOUSLY

      Plaintiffs have filed suit against the above-named Defendant for the violation of

their rights under Title III of the Americans with Disabilities Act, 42 U.S.C. § 12182,

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, New York State Human

Rights Law, N.Y. Exec. § 296, New York City Human Rights Law, New York City,

N.Y., Admin. Code § 8-107(4), and 10 N.Y.C.R.R. § 405.7.  Because the public

disclosure of Plaintiffs' true names and address could subject them and their children to

severe injury and harm, they ask to be allowed to proceed anonymously in this action.

### FACTS

      Plaintiffs Jane Doe and John Doe are persons who are deaf and were

discriminated against on the basis of their disability by Defendant Interfaith Medical

Center ("Interfaith") in connection with Jane Doe's nine-day psychiatric hospitalization



at Interfaith.  The gravamen of their complaint is that Interfaith failed to provide plaintiffs with effective communication as required by applicable law.

Ms. Doe's hospitalization resulted from a suicidal episode in March 2003. Declaration of Jane Doe ("Jane Doe Decl.") at ¶ 4.  At that time, Ms. Doe was diagnosed with Major Depression, a serious mental illness.  *Id.*  The suicidal episode followed a dispute with Mr. Doe.  Declaration of John Doe ("John Doe Decl.") at ¶ 5.

Plaintiffs have two minor children, Jack Doe and Jill Doe, ages 9 and 4, respectively.  *Id.* ¶ 3.  As alleged in the Does' Complaint, the Doe children have received health care services at Interfaith in the past and seek to receive them in the future.

The Does have kept the details of Ms. Doe's hospitalization and mental illness confidential, and have not disclosed them except to family members and other close confidantes, their counsel, and medical and social work professionals.

The Doe family lives at ██████████████████████████ which is only one block away from Interfaith.  Plaintiff's Complaint at ¶ 11.  The Does' address is relevant in this action because other courts deciding claims similar to Plaintiffs' have held that persons who are deaf have standing to require hospitals to provide effective communication in the future where those persons can demonstrate that they are likely to receive treatment at the hospitals in question.  *See, e.g., Schroedel v. New York University Medical Center*, 885 F. Supp. 594 (S.D.N.Y. 1995) (requiring that plaintiff establish a real and immediate threat of future harm); *Constance v. State University of New York Health Science Center at Syracuse*, 166 F. Supp. 2d 663 (N.D.N.Y. 2001) (same); *Bravin v. Mount Sinai Medical Center*, 186 F.R.D. 293 (S.D.N.Y. 1999) (same).

Plaintiffs believe that they and their children face a serious risk of harassment, humiliation, and injury if the private information described above is made public in connection with their true names and address.  Jane Doe Decl. at ¶ 3.  Plaintiffs' sense of

2

privacy would be violated if they received inquiries regarding mental illness or their domestic situation from acquaintances or strangers. *Id.* ¶¶ 6, 7. Plaintiffs are particularly concerned that their children might be confronted with such inquiries at school or in the community. *Id.* ¶ 7. Plaintiffs' concerns are heightened by the fact that their home address will be revealed in connection with this action, because an inquiry made of them at their home would severely violate their sense of privacy and security. *Id.* ¶ 6. Plaintiffs believe they and their children would sustain serious emotional distress and other harm if confronted with such inquiries. *Id.* ¶ 7.

## ARGUMENT

Plaintiffs' action involves confidential matters of the utmost intimacy. In order to avoid humiliation, harassment, and other injury, Plaintiffs ask this Court to permit them to proceed anonymously in this action. Plaintiffs make this request based on a real and reasonable concern for their privacy.

Courts have long allowed plaintiffs to proceed anonymously in order to protect against the disclosure of sensitive facts and to ensure "privacy in a very private matter." *Doe v. United Services Life Insurance Co.*, 123 F.R.D. 437, 439 (S.D.N.Y. 1988) (internal quotation omitted). It is "common for plaintiffs, both minors and those over the age of majority, to be permitted to proceed under a pseudonym where the case concerns matters of a highly sensitive and personal nature." *Moe v. Dinkins*, 533 F. Supp. 623, 627 (S.D.N.Y. 1981). Courts have allowed anonymous proceedings in cases involving such sensitive issues as prescription drug use, *see, e.g., Roe v. Ingraham*, 364 F. Supp. 536 (S.D.N.Y. 1973), abortion, *see, e.g., Roe v. Wade*, 410 U.S. 113, 93 S. Ct. 705 (1973), mental illness, *see, e.g., Doe v. Harris*, 495 F. Supp. 1161 (S.D.N.Y. 1980); *Doe v. Colautti*, 592 F.2d 704 (3d Cir. 1979), marriage, *see, e.g., Moe v. Dinkins*, 533 F. Supp. 623, illegitimacy, *see, e.g., James v. Jacobson*, 6 F.3d 233 (4th Cir. 1993), and sexual

3

orientation, *see, e.g., Doe v. United Services Life Insurance Co.*, 123 F.R.D. 437. The decision to permit plaintiffs to proceed anonymously rests within the sound discretion of the Court. *See EW v. New York Blood Center*, 213 F.R.D. 108, 110 (E.D.N.Y. 2003).

In deciding whether to allow plaintiffs to proceed under a pseudonym, courts must balance plaintiffs' compelling need for privacy against the policy in favor of open judicial proceedings and a defendant's right to know against whom he or she is litigating. "The ultimate test for permitting a plaintiff to proceed anonymously is whether the plaintiff has a substantial privacy right which outweighs the customary and constitutionally-embedded presumption of openness in judicial proceedings." *Doe v. Frank*, 951 F.2d 320, 323 (11th Cir. 1992) (internal quotation marks omitted); *see also Mateer v. Ross, Suchoff, Egert, Hankin, Maidenbaum & Mazel, P.C.*, 1997 WL 171011, at *5 (S.D.N.Y.) (quoting *Frank* with approval); *EW*, 213 F.R.D. at 110 (same).

In balancing these interests, courts have considered many factors, including:

- whether a plaintiff would risk suffering injury if identified;

- whether the interests of children are at stake;

- whether a plaintiff would be required to disclose information of the utmost intimacy; and

- whether the party defending against a suit brought under a pseudonym would be prejudiced.

*See, e.g., Jacobson*, 6 F.3d at 238-39; *Stegall*, 653 F.2d at 185-86. These factors weigh strongly in favor of allowing Plaintiffs to proceed anonymously in this action.

Risk of Injury Through Disclosure. If Plaintiffs' identities are publicly disclosed, they will be at serious risk of injury through discrimination and harassment based upon the facts alleged in the Complaint, especially those concerning mental illness, suicide and

domestic problems. Plaintiffs' concerns are heightened by the fact that their home address will be revealed in connection with this action, something not normally required of civil litigants.

Plaintiffs' Children's Interests. The fact that public disclosure of Plaintiffs' identity could also have a harmful effect on innocent non-parties to this case also counsels in favor of allowing Plaintiffs to proceed anonymously. *See Jacobson*, 6 F.3d at 238, 241 (the adverse effects of public disclosure on young and innocent non-parties weighs in favor of anonymity). The Does' children should not be subject to discrimination, harassment and humiliation on account of their parents' desire to seek redress for being discriminated against because they are deaf.

Matters of the "Utmost Intimacy." Public disclosure of Plaintiffs' identities would expose information of utmost intimacy: Jane Doe's suicidal episode and mental illness are alleged on the face of the Complaint. Further details surrounding the events in the Complaint are sensitive as well. In *Doe v. City of New York*, 1985 WL 4401, at *1 (S.D.N.Y. 1985), the court allowed a homeless couple challenging shelter rules to proceed anonymously when the "disclosure of the facts contained in the Complaint would cause public embarrassment to plaintiffs[,] . . . adversely affect plaintiffs' status in the community[,] and perhaps have an adverse effect on their abilities to pursue future livelihoods. . . ." The same is true in Plaintiffs' case. Filing publicly might lead to stigmatization of Jane Doe because of her mental illness and suicidal episode, and stigmatization of Jane and John's relationship because of their domestic problems, subjecting the children to embarrassment and unnecessary vulnerability.

No Prejudice to Defendant. Interfaith will not be prejudiced by the use of a pseudonym because Plaintiffs have provided them with a copy of the Complaint that uses their real names. As one court has stated, there is no disadvantage to a defendant when it

5

knows plaintiffs' true identity and "will have full discovery rights as the case progresses, and . . . [is] only . . . barred from using or disclosing the fruits of its discovery for purposes other than the defense of [the] action." *United Services Life Insurance Co.*, 123 F.R.D. at 439. Moreover, the Defendant "is not an ordinary private party, with interests relating solely to its personal life and business reputation — rather, [Defendant] is organized solely to perform an important, public service," a consideration this Court has found relevant in a prior case. *EW*, 213 F.R.D. at 112 (allowing plaintiff to proceed anonymously against a private blood bank).

Although Plaintiffs recognize that the public has an interest in knowing the "pertinent facts" of their case, this interest must be weighed against the threat of humiliation and harassment faced by Plaintiffs if their identities and address were publicly disclosed. *See id.* Granting Plaintiffs anonymity in this case would "not obstruct the public's view of the issues or the court's performance in resolving them," nor would the "assurance of fairness preserved by public presence at trial" be lost by allowing Plaintiffs to file their suit under a fictitious name. *Stegall*, 653 F.2d at 185. Given the risks to Plaintiffs if this lawsuit is filed under their real name, as well as the other factors favoring anonymity, this is exactly the type of case in which the public's interest in information is outweighed by a plaintiff's compelling need for privacy.

## CONCLUSION

To avoid the serious harm that public disclosure of Plaintiffs' identities and address will create, Plaintiffs asks this Court to (*a*) file an anonymous complaint, available to the public, using the pseudonyms Jane Doe and John Doe in this action; (*b*) file a non-anonymous Complaint with the clerk to be filed under seal; (*c*) permit them to proceed in this action under the pseudonyms of John Doe and Jane Doe; (*d*) identify their children in connection with this action as Jack and Jill Doe; (*e*) identify their address as

6

1000 Main Street, Brooklyn, New York; and (*f*) to file all documents related to the Order

to Show Cause (including this Memorandum, the Plaintiffs' Declarations, and the

Declaration of Steve Vaccaro) under seal.

Dated: New York, New York
       January 2b, 2005

DEBEVOISE & PLIMPTON LLP

By: _____

    Steve Vaccaro (SV-4644)
    Ethan J. Leib (EL-6700)
    919 Third Avenue
    New York, New York  10022
    Tel: (212) 909-6000
    Fax: (212) 909-6836

and

NEW YORK LAWYERS FOR THE
PUBLIC INTEREST, INC.

Michael D. Silverman (MS-1116)
Marianne L. Engelman Lado (ML-6749)
Rebecca Price (RP-5014)
151 West 30th Street, 11th Floor
New York, New York  10001
Tel: (212) 244-4664
Fax: (212) 244-4570

Attorneys for Plaintiffs

7

CONFIDENTIAL

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------- x

JANE DOE and JOHN DOE, Plaintiffs, - against - | INTERFAITH MEDICAL
CENTER, INC., Defendant.

:::::::::::

Civil Action No. *05-674 (CBA)*

**DECLARATION OF** ████████████

-------------------------------- x

████████████ under the penalty of perjury, deposes and says:

1.      I am the Plaintiff identified as Jane Doe in the above-captioned case. I submit this declaration in support of Plaintiffs' Order to Show Cause to Proceed Anonymously. I have personal knowledge of the facts stated herein.

2.      I am deaf and am the mother of two hearing children.

3.      I am seeking to proceed anonymously in this action in order to minimize the risk that I and my family will be subjected to humiliation and harassment on account of my lawsuit. I am further requesting permission to list my minor children, ████ (9 years old) and ██████ (4 years old), anonymously in the Complaint as Jack and Jill, respectively. Finally, I wish to keep my full address under seal.

4.      The lawsuit I am commencing makes reference, in the Complaint, to a suicidal episode I suffered in March 2003, resulting in my hospitalization at defendant Interfaith Medical Center for Major Depression, a serious mental illness. It also makes reference to my children, who are minors. Moreover, the facts that led to the mental illness and suicidal episode raise very sensitive issues of my domestic relations with my husband and implicate interactions I had with a children's services agency, the New York City Administration for Children's Services ("ACS").

5.      One of the bases for this lawsuit is that I was not able to get adequate mental health care at the Defendant's health care facility because the Defendant failed to provide interpreter services, as required by law. A domestic dispute with my husband led to the relevant suicidal episode, which, in turn, led to the inadequate care provided by the Defendant. I received an inquiry from ACS when they learned of my episode and the



domestic dispute that led to it. I presently have [monthly] meetings with an ACS social worker.

6.     I am seeking to proceed anonymously in this action to minimize the risk that I will be subjected to humiliation and harassment by anyone in my community on account of these facts. I am concerned because this lawsuit involves information of a very sensitive and personal nature. I am particularly concerned that the press will not respect my privacy if my name and address are made part of the public records of this Court.

7.     My children and my family should be protected from the sensitive details of this lawsuit to the extent possible; and it is important that my children's names be protected as well. I do not want my children being confronted with details about this lawsuit in school or in the community: I believe they would suffer serious emotional distress and other harm if our names were made public. Public disclosure of my identity might also result in heightened review by ACS of our family's status or even review of present custody arrangements for our children.

I declare under the penalty of perjury that the foregoing is true and correct.

███████████████████████████████

Dated: January 27, 2005
       New York, New York

## CONFIDENTIAL

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------x

JANE DOE and JOHN DOE, Plaintiffs, - against - INTERFAITH MEDICAL
CENTER, INC., Defendant.

Civil Action No. 05- 674 (CBA)

**DECLARATION OF** ████████████

------------------------------------------------x

████████████ under the penalty of perjury, deposes and says:

1.    I am the Plaintiff identified as John Doe in the above-captioned case. I submit this declaration in support of Plaintiffs' Order to Show Cause to Proceed Anonymously. I have personal knowledge of the facts stated herein.

2.    I am deaf and am the father of two hearing children.

3.    I am seeking to proceed anonymously in this action in order to minimize the risk that I and my family will be subjected to humiliation and harassment on account of my lawsuit. I am further requesting permission to list my minor children, ████ (9 years old) and ██████ (4 years old), anonymously in the Complaint as Jack and Jill, respectively. Finally, I wish to keep my full address under seal.

4.    The lawsuit I am commencing makes reference, in the Complaint, to a suicidal episode my wife suffered in March 2003, resulting in her hospitalization at defendant Interfaith Medical Center for Major Depression, a serious mental illness. It also makes reference to my children, who are minors. Moreover, the facts that led to the mental illness and suicidal episode raise very sensitive issues of my domestic relations with my wife and implicate interactions I had with a children's services agency, the New York City Administration for Children's Services.

5.    One of the bases for this lawsuit is that I was not able to serve as an effective patient representative for my wife at the Defendant's health care facility because the Defendant failed to provide interpreter services, as required by law. A domestic dispute with my wife led to the relevant suicidal episode, which, in turn, led to the inadequate care provided by the Defendant. I received an inquiry from ACS when they



CONFIDENTIAL

learned of my wife's episode and the domestic dispute that led to it.  I presently have [monthly] meetings with an ACS social worker.

6.      I am seeking to proceed anonymously in this action to minimize the risk that I will be subjected to humiliation and harassment by anyone in my community on account of these facts.  I am concerned because this lawsuit involves information of a very sensitive and personal nature.  I am particularly concerned that the press will not respect my privacy if my name and address are made part of the public records of this Court.

7.      My children and my family should be protected from the sensitive details of this lawsuit to the extent possible; and it is important that my children's names be protected as well.  I do not want my children being confronted with details about this lawsuit in school or in the community: I believe they would suffer serious emotional distress and other harm if our names were made public.  Public disclosure of my identity might also result in heightened review by ACS of our family's status or even review of present custody arrangements for our children.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: January 27 2005
       New York, New York

CONFIDENTIAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------ x

JANE DOE and JOHN DOE,

                              Plaintiffs,

            - against -


INTERFAITH MEDICAL CENTER, INC.,

                              Defendant.

------------------------------------------------------ x

Civil Action No. 05-674 (CBA)

**DECLARATION OF
STEVE VACCARO**


STEVE VACCARO, an attorney admitted to practice before this Court, under the

penalty of perjury, deposes and says:

    1.      I am an attorney with Debevoise & Plimpton LLP, co-counsel for

Plaintiffs in this matter with New York Lawyers for the Public Interest, Inc.  I submit this

Declaration in Support of Plaintiffs' accompanying Order to Show Cause to Proceed

Anonymously.

    2.      This disability discrimination action arises out of the Defendant Interfaith

Medical Center's ("Interfaith's") unlawful discrimination against Plaintiffs Jane and John

Doe, who are deaf.  Both Mr. and Ms. Doe were denied interpreter services in connection

with Ms. Doe's nine-day psychiatric hospitalization at Interfaith.  Interfaith's repeated

and ongoing refusals to provide Plaintiffs with interpreter services violates Plaintiffs'

rights against discrimination under both federal and New York law, as set forth in

Plaintiffs' Complaint.

21881563v1

CONFIDENTIAL

3.      The events giving rise to Ms. Doe's hospitalization involve a suicidal episode, mental illness, a domestic dispute, and other private matters of a highly personal and stigmatizing nature. *See* Declaration of Jane Doe and Declaration of John Doe (together, "Plaintiffs' Declarations"). Although the fact of Ms. Doe's suicidal episode and mental illness pertain directly to the cause of action, the details surrounding those matters are irrelevant to Plaintiffs' claims and are highly private and personal. There is a substantial risk that those personal details will be publicly disclosed in connection with this action unless Plaintiffs are allowed to proceed anonymously. Moreover, since the location of Plaintiffs' home address — approximately one block from Interfaith — *is* relevant to this action as it relates to their claims for injunctive relief, Plaintiffs risk an intrusion upon their privacy far greater than most litigants, who are not required to disclose their home address in order to sue.

4.      Plaintiffs' vulnerability to intrusion upon their privacy is magnified because their family includes minor children, aged 9 and 4, whose medical care is also at issue in this action. Plaintiffs' Declarations, at ¶ 3. Public disclosure of Ms. Doe's mental illness, suicidal episode, and other facts regarding the Doe's domestic situation along with the Doe's address, poses a grave risk of humiliation, stigmatization, and emotional distress to the Doe children. *Id.* at ¶¶ 6, 7.

5.      Plaintiffs therefore seek to proceed anonymously in this action to minimize the risk that they will be subjected to public disclosure of their personal lives.

6.      Plaintiffs move to proceed anonymously by order to show cause instead of by notice of motion because they seek expedited relief contemporaneous with the filing of the Complaint.

2

I declare under the penalty of perjury that the foregoing is true and correct.

STEVE VACCARO

Dated: January 28, 2005
       New York, New York